**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) **Case No. 17-cr-258** |
| **Plaintiff,** | ) |
| | ) **Judge Dan Aaron Polster** |
| **v.** | ) |
| | ) **OPINION & ORDER** |
| **SHAWN RAY SMITH,** | ) |
| | ) |
| **Defendant.** | ) |

Before the Court is Defendant Shawn Ray Smith's Motion to Suppress and Request for a
Hearing (the "Motion"). ECF Doc. 140. The Court previously granted Smith's hearing request and
held a suppression hearing on May 24, 2022. *See* ECF Doc. 158. Now, for the reasons that follow,
the Motion is DENIED.

## BACKGROUND

**A.**   **Relevant Facts**[1]

On February 5, 2016, the Ashtabula County Sheriff's Office ("ACSO") began an
investigation into the overdose death of Jennifer Knight, who passed away early that morning in
the home she shared with her mother and two young daughters. ECF Doc. 159, Suppression
Hearing Transcript (hereinafter, "Tr.") at 6; ECF Doc. 166, Government's Suppression Hearing
Exhibits (hereinafter, "Hr'g Ex."), Ex. 1: ACSO Incident Report at 19. The investigation started
when ACSO Deputy Leonard Emch reported to Ms. Knight's home at approximately 6:00 a.m. *See*
Hr'g Ex. 1 at 19. There, Deputy Emch learned from Ms. Knight's family that her vehicle was
missing, and he reported it as stolen. *Id.* at 19-20; Tr. at 6-7.

---

[1] The following statement of facts is taken from the suppression hearing testimony and exhibits.

The investigation quickly pointed to Defendant Shawn Ray Smith's possible involvement in Ms. Knight's death, as Ms. Knight's family informed Deputy Emch that Ms. Knight recently spent time with Smith. Tr. at 34; Hr'g Ex. 1 at 20-21. Deputy Emch was aware that Smith was involved with drug trafficking and knew Smith through Smith's previous encounters with ACSO, including an outstanding warrant Deputy Emch had issued for Smith's arrest two years earlier. Tr. at 13-14, 36-37; Hr'g Ex. 1 at 20-21; *see also* Hr'g Ex. 2: ACSO Arrest Warrant for Shawn Ray Smith at 3.

Based on the tip from Ms. Knight's family, Deputy Emch requested that the Trumbull County Sheriff's Office ("TCSO") assist the ACSO investigation by looking for Ms. Knight's missing vehicle at Smith's residence, which was within Trumbull County. Tr. at 7; Hr'g Ex. 1 at 21. TCSO agreed to assist, and TCSO Sergeant Kaintz proceeded to Smith's residence on Penniman Road. Tr. at 59, 81.

When Sergeant Kaintz arrived at Smith's residence, he observed Ms. Knight's missing vehicle parked in the driveway. *Id.* at 59, 82. Sergeant Kaintz provided this information to Deputy Emch, who then met Sergeant Kaintz at the residence to locate Smith and to execute the arrest warrant. *Id.* at 7, 59. Several other TCSO deputies also reported to Smith's residence to assist the investigation. *Id.* at 35.

After Deputy Emch arrived on the scene at approximately 9:00 a.m., he and Sergeant Kaintz encountered Smith's roommate, Ryan Minick, standing in the driveway near Ms. Knight's missing vehicle. *Id.* at 7-8, 59. As with Smith, Deputy Emch was familiar with Mr. Minick from prior encounters with ACSO and knew that Mr. Minick had arrests for domestic violence, unauthorized use of vehicles, and felonious assault. *Id.* at 10-11, 32-33.

Mr. Minick confirmed that Smith was inside their apartment unit, and the deputies then handcuffed Mr. Minick, detained him in the back of a deputy's vehicle, and sought his consent to enter the residence. *Id.* at 8, 11, 60-61, 76 159-60. Although the deputies believed they could enter the home on the arrest warrant, they also sought Mr. Minick's consent out of an abundance of caution. *Id.* at 14-15, 76. Deputy Emch and Sergeant Kaintz explained to Mr. Minick that they were investigating the "hot dope" that lead to Ms. Knight's death and presented him with ACSO's standard consent form. *Id.* at 8, 11, 61, 78. The deputies reviewed the form with Mr. Minick, who then signed it and authorized the deputies' entry. *Id.* at 8, 61, 63; *see also* Hr'g Ex. 4: Minick First Consent Form at 1. When Mr. Minick consented to the warrantless search, he was still detained, but Mr. Minick felt as though the deputies were "going to go in [the residence] regardless" of whether he consented to the entry. Tr. at 77, 163-64. The deputies explained that they had an arrest warrant for Smith and that they would obtain a search warrant if necessary. *Id.* at 9, 78, 161.

After receiving Mr. Minick's consent, the deputies attempted to enter the residence, which was one of three small apartment units in a prefabricated home. *Id.* at 12-13, 21, 24-26, 61; *see also* Hr'g Exs.7-14: Penniman Road Residence Photographs. But, when Deputy Emch knocked on the door and announced himself, there was no answer. Tr. at 12-13, 61. The deputies sought and obtained Mr. Minick's verbal consent to enter the residence by force. *Id.* at 15, 61-62, 77. At that point, Deputy Emch kicked down the kitchen door and entered the premises. *Id.* at 15, 62.

Once the deputies gained entry to the residence, they encountered four individuals in the living room: Smith, Ms. Jessica Ebelender, and two other men. *Id.* at 17, 23, 158. Ms. Ebelender was at the residence because she was dating Mr. Minick. *Id.* at 175. She had used narcotics the night before but was sober that morning, and she recalled that the deputies forcefully entered the house and screamed that she and the other occupants were responsible for Ms. Knight's death. *Id.*

Smith, Ms. Ebelender, and the other two individuals were immediately handcuffed, searched, cleared for weapons, and detained in the living room for the remainder of the encounter. *Id.* at 17, 23, 88, 181. At some point after their detention, Deputy Emch issued *Miranda* warnings to all four individuals, including Smith. *Id.* at 17, 23.[2]

After Smith and the others were detained, the deputies conducted a protective sweep and located a closed black container in plain view on the dining room table. *Id.* at 17, 20-21, 69-70. This container was made of black metal, and it had a rubberized rib exterior, metal enforced edges, a combination lock, and a rubberized handle. Tr. 53-54; *see also* Hr'g Ex. 18: Gun Case; Hr'g Ex. 18-1: Gun Case Photograph. Although the closed black container did not bear and markings or firearm insignia, Deputy Emch and Sergeant Kaintz both identified it as a "gun case" based on their training and prior experience with similar gun cases, as well as their knowledge that such gun cases were common in the community. *Id.* at 17, 20-22, 50-51, 70-72, 90. The deputies then determined that Smith and the other individuals were potentially within reaching distance of a firearm and opened the case to find a handgun and suspected narcotics. Tr. at 28-29, 30-31, 42, 72-75; Hr'g Ex. 16: Opened Gun Case Photograph.

Once contraband was found in the residence, the deputies sought to search the remainder of the house, and Mr. Minick executed a second consent form to authorize a search of his bedroom. Tr. at 74-75; Hr'g Ex. 5: Minick Second Consent Form at 1. There, the deputies found additional contraband firearms. Tr. at 101-02.

Smith, however, refused to allow the deputies to search his locked bedroom, so the deputies obtained a search warrant. Tr. at 93-94; Hr'g Ex. 6: TCSO Search Warrant. The warrant application

---

[2] Sergeant Kaintz could not recall at the hearing whether Deputy Emch mirandized the four individuals. Tr. at 68. Similarly, Ms. Ebelender testified that she was next to Smith when they were detained, and she did not receive *Miranda* warnings. Tr. at 176-77, 180.

was completed by TCSO Detective Michael Yannucci, who was not on the scene but learned the investigation's details from Sergeant Kaintz. Tr. at 96; Hr'g Ex. 6 at 1-3. In the warrant affidavit, Detective Yannucci relied on the items found in the black case to establish probable cause to search Smith's bedroom. *Id.* In doing so, Detective Yannucci described the contraband as being in "plain view" and submitted photographs of the opened case with the application Tr. at 96, 98; Hr'g Ex. 6 at 1-3, 6. Thereafter, the deputies searched Smith's bedroom, where they found more narcotics and contraband firearms. Hr'g Ex. 1 at 21.

Smith was eventually arrested and transported to the Ashtabula County Jail, where he was interviewed by ACSO Detective Terry Moisio. Tr. at 50, 116-17. Deputy Emch informed Detective Moisio that Smith had been mirandized at the scene of the arrest, and Detective Moisio confirmed with Smith that he had been mirandized at the scene of the arrest. *Id.* at 118-19.  Detective Moisio neither gave Smith any additional *Miranda* warnings before the interview nor asked him to sign a *Miranda* waiver.  Tr. at 118-19, 127-28. This interview was not videotaped, and it was a short conversation about the investigation into Ms. Knight's overdose. *Id.* at 117-21.

Two days later, Smith sat for a longer, recorded interview with DEA Task Force Officer Taylor Cleveland. *Id.* at 136-37. TFO Cleveland gave *Miranda* warnings prior to starting the interview, and Smith still participated in the interview. *Id.* at 139. During the interview, TFO Cleveland found Smith to be responsive and coherent, and he did not perceive Smith to be exhibiting any symptoms of heroin withdrawal. *Id.* at 138-89. Smith further informed TFO Cleveland that he was no longer "dope sick." *Id.* at 152; *see also* ECF Doc. 143: Interview Video at 4:37-6:40.

At the outset of the second interview, Smith asked if his statements will be used against him, and TFO Cleveland evaded the question by stating that it "depends on what . . . [Smith is]

admitting to." Tr. at 149; *see also* ECF Doc. 143 at 2:08-4:11. TFO Cleveland went on to state that, if Smith admits to "burying a body in the backyard," then he will be charged, but TFO Cleveland's ultimate goal is to after the drug trafficker that sold narcotics to Smith. *Id.* Later, Smith asked if this conversation would help him with his charges in Geauga County. ECF Doc. 143 at 34:13-36:45. TFO Cleveland at first gave a lengthy non-response about why Smith should be honest, but he eventually explained that the decision to bring charges in Geauga County was up to the county prosecutor. *Id.* During the conversation, TFO Cleveland also repeatedly represented that he would look out for Smith because TFO Cleveland "need[ed] [Smith] to make the case" against the drug trafficker who sold the heroin that killed Ms. Knight. *Id.* Smith stated that he felt responsible for Ms. Knight's death, and he said he would "burn every bridge" to take down the drug trafficker. *Id.* at 40:42-50:38. Smith then told TFO Cleveland about the drug trafficker, and he twice admitted to providing Ms. Knight the heroin that killed her. Tr. at 146-47; ECF Doc. 143 at 24:01-40:42, 54:00-59:15.

## B.  <u>Procedural History</u>

On July 6, 2017, Smith was indicted in the instant case for his alleged drug trafficking activities and unlawful firearm possession, and he has been charged with eight offenses: distribution of heroin, cocaine, fentanyl, and methamphetamine (Count 1), possession with intent to distribute various controlled substances (Counts 2-6), possession of a firearm and ammunition by a convicted felon (Count 7), and possession of a firearm in furtherance of a drug trafficking crime (Count 8). ECF Docs. 21, 61. On Count One, Smith is facing a potential sentence enhancement for allegedly providing to Ms. Knight the heroin, cocaine, fentanyl, and/or methamphetamine that caused her overdose death. ECF Doc. 61 at ¶¶ 3-4.

On December 28, 2021, Smith moved to suppress much of the evidence against him, namely all the physical evidence seized from Smith's residence and all the statements Smith made after his arrest. ECF Doc. 140. The Government opposed the Motion in its entirety and filed its response brief on February 28, 2022. ECF Docs. 148, 149. Smith then submitted a reply brief on April 14, 2022. ECF Doc. 151.

The Court held a suppression hearing on May 24, 2022. ECF Doc. 155. During the hearing, the Government called Deputy Emch, Sergeant Kaintz, Detective Yannucci, Detective Moisio, and TFO Cleveland, all of whom testified to the circumstances of Smith's arrest and subsequent interviews. Tr. at 5-155. Smith exercised his right not to testify, and he instead called Mr. Minick and Ms. Ebelender to describe the events. *Id.* at 156-85.

Following the hearing, the Court allowed counsel to submit supplemental briefing, and both parties did so. *Id.* at 185; ECF Docs. 159, 167. The Court has reviewed the supplemental briefs, the original briefs, the parties' exhibits, and the hearing transcripts, and now denies the Motion for following reasons.

## ANALYSIS

Smith has identified two constitutional bases for his suppression request. He first asserts that his Fourth Amendment rights were violated and, in turn, moves to suppress all physical evidence from the search of his residence. Smith further states a Fifth Amendment violation, requiring suppression of all statements he made during his interviews with law enforcement. The Court addresses both categories of argument in turn below.

## Fourth Amendment Analysis

The Fourth Amendment protects citizens from unreasonable intrusions by law enforcement: "The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV; *accord Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). "The chief evil against which the Fourth Amendment protects is the physical invasion of the home, and the Fourth Amendment requires that searches of the home be reasonable." *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006) (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)) (internal quotation marks omitted).

Thus, warrantless entries into and searches of a home are presumptively unreasonable and subject only to a few specifically established and well-delineated exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The Government bears the burden of proving by a preponderance of the evidence that the warrantless search was justified, and this must be achieved through "clear and positive testimony" that the law enforcement officers were operating under an exception to the warrant requirement. *United States v. Holland*, 522 F. App'x 265, 273-74 (6th Cir. 2013).

From the foregoing, Smith maintains that his Fourth Amendment rights were violated at two points during his encounter with law enforcement: first, when the deputies entered his residence without a warrant, and second, when the deputies searched the closed black container and used its contents to obtain a search warrant for his bedroom. In response, the Government identifies three exceptions to the warrant requirement: consent, search incident to lawful arrest, and plain view. The Court now considers the circumstances of the deputies' warrantless searches and concludes that the Government has met its burden to overcome the presumption of unreasonableness.

## A.    <u>Entry into the Residence</u>

Turning first to the entry, Smith argues that the deputies cannot justify their warrantless intrusion into his residence. More specifically, Smith maintains that Mr. Minick could not

voluntarily and willingly consent to the entry because Mr. Minick was handcuffed and detained at the time deputies solicited his consent. ECF Doc. 159 at 2-3. According to Smith, Mr. Minick established this coercion during the suppression hearing when he testified that he signed the consent forms because the deputies "were going to go in regardless" of whether he consented. *Id.* Additionally, Smith alternatively argues that, even if Mr. Minick's consent was not the product of coercion, Smith ultimately revoked the consent by remaining silent and keeping the door closed when the deputies sought entry into the residence. *Id.* at 3-4.

In response, the Government asserts that the entry was per se reasonable because Smith's outstanding arrest warrant gave deputies the implicit authority to enter his residence. ECF Doc. 148 at 16. In the alternative, the Government justifies the warrantless entry by arguing that the consent exception applies—*i.e.*, that Mr. Minick gave valid consent to enter and search the shared premises. ECF Doc. 167 at 2-4. To support this argument, the Government points to the consent forms Mr. Minick executed, both of which explained the Fourth Amendment rights that would be waived by executing the form. ECF Doc. 148 at 12-15. The Government further argues that Smith's silence when Deputy Emch knocked on the door was insufficient to revoke Mr. Minick's consent to the entry and search of the premises. ECF Doc. 167 at 4-5.

A resident's consent to a warrantless entry into his home is a long-standing and well-recognized exception to the warrant requirement. *Holland*, 522 F. App'x at 273-74; *accord Davis v. United States*, 328 U.S. 582, 593-94 (1946). Indeed, once consent is obtained, a law enforcement officer no longer requires a warrant or probable cause to comport with the Fourth Amendment's strictures. *See United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). This consent may be given by a co-resident who possesses

common authority over the residence. *United States v. Johnson*, 22 F.3d 674, 677-78 (6th Cir. 1994) (*Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).[3]

Such consent must be voluntary and freely given, which occurs when the consent is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) and *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977)). Comparatively, a resident's "mere acquiescence" is insufficient to show that he has consented to a warrantless entry into his home. *Holland*, 522 F. App'x at 274. "Whether these [consent] requirements were met 'is a question of fact to be determined from the totality of all the circumstances,'" and a district court may consider the resident's characteristics, the nature and length of the interaction with law enforcement, and any other relevant circumstance. *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (quoting *Schneckloth*, 412 U.S. at 227).

Here, the Court agrees with the Government that the entry was per se reasonable because the outstanding arrest warrant justified the entry. Indeed, a search warrant carries the implied authority to effectuate the warrant by entering a residence, so long as the arresting officer reasonably believes the arrestee is present within the residence. *Payton*, 445 U.S. at 603. And, here, the deputies had an outstanding arrest warrant for Smith, and Mr. Minick informed the deputies that Smith was in their shared residence. *See* Tr. at 14; Hr'g Ex. 2. Thus, the deputies could enter the residence to effectuate the warrant, and they sought Mr. Minick's consent only out of an abundance of caution. Tr. at 14-15, 76.

Moreover, the Government has further justified the deputies' entry into Smith's residence without a search warrant under the consent exception. Thus, even assuming *arguendo* that the

---

[3] Smith does not dispute that Mr. Minick had common authority over their shared residence.

entry was presumptively unreasonable because the arrest warrant was defective or that the deputies doubted Smith's presence, the Government has presented clear and convincing evidence to rebut that presumption.

After reviewing the totality of the circumstances, the Court finds that Mr. Minick voluntarily and intelligently consented to the deputies' request to enter the residence. The most compelling evidence for this conclusion is Mr. Minick's signed consent form, which describes the nature of Mr. Minick's Fourth Amendment rights and states that Mr. Minick had the right to refuse the deputies' request. *See* Hr'g Ex. 4. Moreover, Deputy Emch testified that he read the consent form to Mr. Minick and explained its contents to him. Tr. at 11-12. Sergeant Kaintz similarly testified that he observed Mr. Minick read and execute the form. *Id.* at 63-65. Given that both deputies' testimony is consistent, the Court credits their recollection of events. Furthermore, Mr. Minick testified that he signed the consent form and that the deputies talked with him about their request to enter the residence. *Id.* at 162-65, 170. Again, this account is consistent with that of the deputies, and the Court credits Mr. Minick's testimony.

While the Court agrees with Smith that the circumstances under which Mr. Minick gave his consent—*i.e.*, while handcuffed and detained in a police cruiser—raise the specter of coercion, the facts adduced at the suppression hearing do not support Smith's coercion argument. In fact, Mr. Minick was given the opportunity to testify that he felt coerced or threatened, but he simply did not do so. At most, he expressed some indifference to the deputies' request and felt like "they were going to go in regardless" of whether Mr. Minick signed the form. *Id.* at 164. Smith describes this statement as "mere acquiescence" and argues that it is insufficient to establish voluntary consent, but the Court disagrees with this characterization. Rather, the hearing testimony confirms that the deputies explained they could obtain a search warrant and enter the home even without

Mr. Minick's consent. *Id.* at 9, 78, 161. That testimony in turn explains Mr. Minick's remark that the deputies would enter the residence regardless of his decision: he was not merely acquiescing to the deputies' request, but he rather voluntarily consented after learning that withholding his consent would only delay the inevitable. Thus, Mr. Minick's resignation to the deputies' entry does not convert his voluntary consent into a product of coercion, particularly because Mr. Minick had been arrested previously and had familiarity with the criminal justice system.

Moreover, the Court is unpersuaded by Smith's argument that he implicitly revoked Mr. Minick's consent by refusing the deputies' attempts to enter the home. To be sure, Smith is partially correct on the law, and a physically present co-resident may revoke another co-resident's consent. *United States v. Johnson*, 656 F.3d 375, 379 (6th Cir. 2011). However, such revocation must be expressly made, *id.*, and Smith claims only that he implicitly revoked his consent by not unlocking the doors. The uncontradicted hearing testimony further confirms that Smith did not expressly revoke Mr. Minick's consent—both Deputy Emch and Sergeant Kaintz testified that there was no response when they knocked on the door and announced themselves, and neither Mr. Minick nor Ms. Ebelender testified that they heard Smith communicate anything to the deputies. Tr. at 12-13, 61. Therefore, the Court finds that Smith did not revoke Mr. Minick's consent.

In sum, the deputies' entry into Smith's home did not violate his Fourth Amendment rights. The deputies could enter Smith's home to execute the arrest warrant, Mr. Minick voluntarily and intelligently consented to the entry, and Smith did not expressly revoke that consent. Therefore, Smith is not entitled to suppression on this ground.

## B.    <u>Search of the Closed Container</u>

Turning next to the search of the closed black container, Smith argues that the container carried a reasonable expectation of privacy, and the deputies had no basis to open it. ECF Doc.

159 at 4-5. In turn, Smith claims that the search warrant affidavit was tainted by the unlawful search because the deputies relied on the close containers' contents—a firearm and suspected narcotics—when obtaining the search warrant for Smith's bedroom. *Id.* Smith further maintains that the search warrant affidavit contained a materially false statement because it described the contraband as being in plain view, when it was actually in a closed, opaque container. *Id.*

In response, the Government provides two Fourth Amendment exceptions to support the deputies' search of the closed black container. First, the Government maintains that the deputies could open the container as part of a search incident to Smith's lawful arrest. ECF Doc. 167 at 5-6. The Government further asserts that the criminal nature of the closed black container was immediately apparent to trained deputies, such that the container's contents were in plain view. ECF Doc. 148 at 16-17. The Court considers both of the Government's justifications in turn.

### 1.    *Search Incident to Arrest*

An officer may conduct a warrantless search incident to a lawful arrest as means to ensure officer safety and to prevent destruction of evidence. *Chimel v. California*, 395 U.S. 752, 763 (1969); *see also Riley v. California*, 573 U.S. 373, 382 (2014). When conducting such a search, the law enforcement officer may search "the arrestee's person and the area within his immediate control" without obtaining a warrant. *United States v. Buford*, 632 F.3d 264, 268 (6th Cir. 2011) (internal citations omitted).

Importantly, the Supreme Court has recently limited the scope of a search incident to arrest: once an arrestee has been handcuffed or otherwise secured, the law enforcement officer may no longer search the area that was previously within the arrestee's control prior to the arrest. *Arizona v. Gant*, 556 U.S. 332, 349-50 (2009). In announcing this new limitation, the Supreme Court explained that allowing an officer to continue a search after the arrestee has been secured is

anathema to the Fourth Amendment: "Indeed, the character of that threat implicates the central concern underlying the Fourth Amendment—the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Id.* at 345.[4] Thus, *Gant* overruled the search-incident-to-arrest standard applied in several circuits—including the Sixth Circuit—which had allowed offers to search the area within the arrestee's immediate control even after the arrestee was secured and the threats articulated in *Chimel* had been mitigated. *See Buford*, 632 F.3d at 268 (recognizing that *Gant* overruled the Sixth Circuit's previous standard); *see also United States v. McCraney*, 674 F.3d 614, 619-20 (6th Cir. 2012) (same).

Here, the Government cannot justify the search of the closed container as part of a search incident to arrest. The hearing testimony conclusively establishes that the closed black container was not opened until *after* Smith and the other individuals were handcuffed and detained. Tr. at 17, 20-23, 69-70, 88. Plus, there were at least as many deputies as there were arrestees, and none of the deputies testified that they were unable to control the scene. *Id.* at 35. Thus, *Gant* dictates that, once Smith and the others were restrained and the scene was controlled, the deputies' could no longer open the container as part of the lawful arrest.

This conclusion is unaltered by the Government's argument that the detainees' proximity to the closed black case justified the search. More specifically, the Government maintains that the Smith and the other individuals were detained mere feet away from the closed container, which created a threat of an arrestee slipping his or her handcuffs, opening the container, seizing a firearm, and turning it on the deputies. ECF Doc. 167 at 6. Yet, even accepting Government's

---

[4] The Court notes that the *Gant* decision involved a search of an automobile incident to arrest, but this distinction does not limit its applicability to searches of a home incident to arrest. Indeed, much of this Circuit's caselaw on searches incident to arrest made inside a home cite to and rely on cases involving automobile arrests. *See, e.g., United States v. Williams*, 483 F.3d 425, 430-31 (6th Cir. 2007) (citing *Chimel* when stating the standard of a search incident to arrest conducted in a home). Moreover, given that the home is entitled more Fourth Amendment protection than an automobile is, *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974), the *Gant* court's concerns about the expansive nature of searches incident to arrest should apply with even more force to a search within the home.

hypothetical as a likely or imminent threat to the deputies, this possibility does not justify *opening* the case and searching its contents after the individuals were detained. Rather, the deputies could have comported with the Fourth Amendment strictures if they had simply *seized* the case and removed it from the individuals' reach to mitigate the threat. *See United States v. Calandrella*, 605 F.2d 236, 249 (6th Cir. 1979) ("[O]nce the agents had seized the item and reduced it to their exclusive control there was no further danger that the defendant would secure therefrom either a weapon or an instrumentality of escape, or would destroy evidence contained in the briefcase.").

The Court is further unpersuaded by the Government's search-incident-to-arrest argument because it is built on the Sixth Circuit's pre-*Gant* decisions, all of which have been abrogated. More specifically, the Government cites these pre-*Gant* cases to argue that the deputies could open the closed black container as part of a search incident to arrest because the container had been in Smith's control prior to the arrest. *See* ECF Doc. 148 at 18-19; ECF Doc. 167 at 5-6 (citing, *e.g.*, *United States v. Williams*, 483 F.3d 425, 430 (6th Cir. 2007) and *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001)). However, as explained above, the *Gant* decision has altered the Sixth Circuit's prior rule, and a post-arrest search of a closed container can no longer be justified solely under the search-incident-to-arrest exception. In fact, the Government cites to only one post-*Gant* decision from the Sixth Circuit, and that opinion thoroughly articulates how *Gant* limited the scope of searches incident to arrest. ECF Doc. 167 at 5 (citing *McCraney*, 674 F.3d at 618-20). Thus, while none of the Government's cited cases have been explicitly overruled, *Gant*'s limit on the scope of a search incident to arrest is implicitly incorporated into the Sixth Circuit's pre-*Gant* decisions. In turn, the Government's cited cases do not justify the deputies' search.

Therefore, the search-incident-to-arrest exception does not justify the deputies' search of the closed black container. The Court next turns to the Government's alternative justification.

2.    *Plain View Doctrine*

While a lawful arrest does not authorize a law enforcement officer to conduct an exploratory search of the arrestee's home, the officer may seize any contraband that is found in plain view during the arrest. *United States v. Cousins*, 841 F. App'x 885, 898 (6th Cir. 2021). To fall within the plain view exception and to comport with constitutional limits, the warrantless seizure must occur when: "(1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed, (2) the item is in plain view, and (3) the incriminating character of the evidence is readily apparent." *United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

Generally, the plain view doctrine allows only for warrantless seizures of contraband, and the exception does not authorize the search of any closed areas, items, or containers. *See United States v. Shye*, 473 F.2d 1061, 1066 (6th Cir. 1973) ("[T]he 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971))). This is because the Fourth Amendment affords protection "to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822-23 (1982).

However, not every closed container is entitled to Fourth Amendment protection. For instance, when a closed container's exterior either announces its criminal contents or fails to conceal it contents, then the contents are then considered to be in plain view. *United States v. McCaster*, 68 F.3d 475(Table), at *2 (6th Cir. 1995); *see also Arkansas v. Sanders*, 442 U.S. 753, 765 n.13 (1979) ("[S]ome containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance."), *overruled on other grounds*, *California v. Acevedo*, 500

U.S. 565 (1991). In turn, this "outward appearance" rule obviates the need for a warrant to open the case: "[I]f the distinctive configuration of a container proclaims its contents, the contents cannot fairly be said to have been removed from a searching officer's view." *Robbins v. California*, 453 U.S. 420, 428 (1981) (plurality opinion) (explaining *Sanders* footnote 13), *overruled on other grounds by United States v. Ross*, 456 U.S. 798 (1982).

Here, the first two elements of the plain view doctrine are met. The first element is satisfied because the Court has previously concluded that the deputies acted lawfully when they entered the residence with Mr. Minick's consent, and the second element is met because there is no dispute that the closed black container was on the dining room table when the deputies arrived.

Thus, only the third element of the plain view doctrine is in dispute, and the question for the Court to resolve is whether the incriminating nature of the closed black container announced its criminal contents. If the container's criminality was immediately apparent to the deputies, then the deputies could lawfully open the container rather than simply seize it for later inspection.

Yet, resolution of this question is complicated by the fact that the circuit courts have split on what standard to use when assessing a closed container's criminal nature. More specifically, the Fourth Circuit has held that a closed container's criminal nature should be assessed from the perspective of the law enforcement officer and should account for the totality of the circumstances under which the closed container was discovered. *United States v. Davis*, 690 F.3d 226, 235 (4th Cir. 2012) (citing *United States v. Williams*, 41 F.3d 192, 198 (4th Cir. 1994)). Thus, if the container's contents are a "foregone conclusion" based on the circumstances and on the officer's experience, then those contents are within plain view. *Id.* Comparatively, the Ninth Circuit has ruled that the incriminating nature of the case must be viewed from a lay person's perspective. *United States v. Gust*, 405 F.3d 797, 801-03 (9th Cir. 2005). That court tightly

circumscribes the outward-appearance exception to protect an arrestee's reasonable expectation of privacy, which is assessed with reference to social norms and not judged by law enforcement's expertise. *Id.* And, most recently, the Third Circuit has used a hybrid approach: it relied on the Fourth Circuit's the totality-of-the-circumstances framework, but it also balanced the arrestee's privacy interest in the closed container at issue to address the Ninth Circuit's concerns. *United States v. Telfair*, 507 F. App'x 164, 174-75 (3d Cir. 2012).

The matter is further complicated because the Sixth Circuit has not opined on the standard by which a closed container's criminality should be assessed. Therefore, the Court is without any binding authority on what standard to use, and instead must first determine which circuit courts' guidance to follow and then must apply that framework to Smith's case.

After reviewing the circuit courts' various decisions, the Court concludes that the Third and Fourth Circuits have articulated the best approach for assessing the criminal nature of a closed container. This is because both circuits allow the Court to consider the totality of the circumstances in which the closed container was found, and the Fourth Circuit further permits consideration of the training and experience on which a law enforcement officer relied when assessing the container's nature. After all, it is trained officers who are actually encountering closed containers during investigations and arrests, and their real-time assessment of such a container is relevant to a court's post-hoc inquiry into the reasonableness of their decision-making. Still, the arrestee's privacy interest in the closed container is not without importance under the Third Circuit's approach, which results in a comprehensive analysis of the competing concerns raised by a motion to suppress.

Comparatively, the Ninth Circuit's sole reliance on a lay person's perspective is seemingly divorced from the reality of a law enforcement officer's daily work. Its standard would require an

officer to ignore his training and attempt to put himself in the shoes of a lay person when assessing a closed container, all while simultaneously managing a potentially dangerous situation and making an arrest. The Court is further unclear on how a lay person's perspective could even be discerned at the suppression hearing. None of this is to say that the Ninth Circuit's concern for reasonable expectations of privacy is unimportant, but rather that its rule is less workable.

Next, applying a combination of the Third and Fourth Circuit's standards here, the Court concludes that the closed black container's criminality was immediately apparent to the deputies. In reaching this conclusion, the Court has considered the deputies' testimony about their experience with gun cases, the circumstances under which the case was found, and Smith's privacy interest in the gun case.

Turning first to the deputies' training and experience, both Deputy Emch and Sergeant Kaintz testified that their training and experience led them to immediately recognized the container as a gun case due to the gun case's physical characteristics, namely the rubberized rib exterior and handle, the metal enforced edges, and the combination lock. *Id.* at 17, 20-21, 50-51, 70-72, 90. Deputy Emch also explained that this type of lockable, hardcover gun case was commonly used in the community, where expensive and heavy gun safes are unattainable and impractical for most community members. *Id.* at 21-22. And, while firearm possession is not typically a crime, the gun case here was evidence of criminality to Deputy Emch because he was familiar with both Smith's and Mr. Minick's prior criminal records and knew it was almost certain that neither could lawfully possess a firearm. *See id.* at 32-33, 36-37.

The additional circumstances in which the closed black container was found further supports the deputies' real-time assessment that it was a gun case. More specifically, the deputies knew that Smith was involved in drug-trafficking, *id.* at 13-14, 36-37, and there is a close nexus

between drug trafficking activity and firearm possession. Plus, the deputies were at Smith's house to investigate an overdose death, which further connects their presence at Smith's residence to his drug-trafficking activity and, in turn, to the gun case.

Finally, while Smith may have a privacy interest in a closed container generally, any such interest was diminished here. The contraband firearm was stored inside a case specifically designed to store firearms, and the gun case is what alerted the deputies to the firearm's presence. The outcome would be different if the contraband firearm had been stored in a dresser drawer, a cereal box, or any other container which would not have revealed the contraband firearm's presence. Yet, as it stands, the contraband firearm was put inside a gun case, and that decision was equivalent to leaving the firearm out in the open.

Alternatively, even if the Court viewed the closed container from the perspective of a lay person under the Ninth Circuit's more stringent framework, its criminality would still be apparent. These types of hard cover cases are typically used to store guns, and a large number of Americans own guns.[5] There are lay persons in every community who would recognize the container at issue as a gun case. The totality of the circumstances would further color a lay person's assessment of the case—namely, that the closed black case was found in the home of an individual known to be involved in drug trafficking during an investigation into an overdose death. Thus, while Smith argues that the closed black container is non-descript and could hold any number of items such a video equipment, its criminal nature was readily apparent under any standard.

In turn, the Court further rejects Smith's argument that the search warrant affidavit contained a materially false statement by describing the contraband as being in plain view. When a closed container's criminality is immediately apparent, the contents are considered to be in plain

---

[5] *See New York St. Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2164 (2022) (Breyer, J., dissenting) (noting that there are nearly 400 million civilian-held firearms in the United States).

view for the purpose of the analysis and no search has occurred. *See Robbins*, 452 U.S. at 428. Thus, Detective Yannucci's affidavit was correct because, to the trained deputies, the contraband was in plain view.

Therefore, overall, the Court concludes that the deputies could open the closed container under the plain view doctrine and, in turn, that the search warrant application was legally accurate. Smith is not entitled to suppression on this ground.

*****

In sum, the Government has justified the deputies' intrusions into Smith's residence and personal belongings. Smith has not suffered any deprivation of his Fourth Amendment rights, and there is no basis to suppress the evidence. Accordingly, the Motion is denied with respect to Smith's request to suppress the physical evidence

### Fifth Amendment Analysis

The Fifth Amendment protects a criminal defendant from, in relevant part, compelled self-incrimination at every stage of a criminal prosecution. U.S. Const., amend. V; *accord United States v. Hubbell*, 530 U.S. 27, 37-38 (2000). Here, Smith argues that the deputies violated this Fifth Amendment right in three ways: first, the deputies failed to provide Smith with *Miranda* warnings in advance of questioning him; second, the detectives interviewed Smith while he was in heroin withdrawal and could not effectively waive his *Miranda* rights; and, third, TFO Cleveland coerced Smith into waiving his *Miranda* rights by making false promises of leniency. The Court addresses all three arguments in turn.

### A.    *Miranda* Warnings

Turning first to the *Miranda* warnings, Smith maintains that he was not mirandized prior to his interview with Detective Moisio. ECF Doc. 151 at 3; ECF Doc. 159 at 5-6. To support this

claim, Smith highlights Deputy Emch's hearing testimony, in which he stated that he "believed" he personally mirandized Smith and the three others when they were detained and that another deputy may have mirandized the group again later in the day. ECF Doc. 159 at 5-6 (citing Tr. at 17). Smith contrasts this with Ms. Ebelender's testimony, who testified that she was sitting next to Smith at all relevant times but did not hear any *Miranda* warnings. *Id.* (citing Tr. at 180).

In response the Government maintains that the deputies' testimony sufficiently demonstrates that Smith received *Miranda* warnings prior to his interview with Detective Moisio. ECF Doc. 167 at 7-8. The Government further discounts Ms. Ebelender's testimony by pointing out that she cannot be seen in the photograph which captures where Smith and the two other men were detained during the search. *Id.* (citing Hr'g Ex. 15). Thus, the Government maintains that Ms. Ebelender was not in a location where she could have heard the *Miranda* warnings, making her testimony of little value. *Id.*

To ensure that the Fifth Amendment right against compulsory self-incrimination is protected, the law requires that a defendant be advised of this right prior to any custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966); *United States v. Calvetti*, 836 F.3d 654, 663 (6th Cir. 2016) ("[*Miranda* warnings] are prophylactic rules stemming from the Fifth Amendment privilege against self-incrimination.").[6] In turn, failure to administer *Miranda* warnings prior to a custodial interrogation creates a presumption of compulsion, and any unwarned statements will be excluded from evidence at trial. *Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985). Thus, the Government bears the burden to prove by a preponderance of the evidence that *Miranda* warnings were given, as well as that any post-

---

[6] Here, there is no dispute that Smith was subjected to a custodial interrogation, and this element of the analysis is satisfied.

*Miranda* statements were made voluntarily and without coercion. *United States v. Ray*, 803 F.3d 244, 269-70 (6th Cir. 2015) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)).

Here, the Court has been presented with contradicting testimony about the *Miranda* warnings, and so this issue must be resolved by making a credibility determination. After reviewing the testimony and hearing exhibits, the Court concludes that the Government has met its burden to show by a preponderance of the evidence that Smith was properly mirandized before his interview with Detective Moisio.

As an initial matter, the Court credits the deputies' testimony about Smith's *Miranda* warnings. Not only did both Deputy Emch and Detective Moisio testify that Deputy Emch read Smith his *Miranda* rights at the scene of his arrest, but this testimony is also corroborated by their contemporaneous police reports, which state that Deputy Emch mirandized Smith. Tr. at 17, 23, 118-19; Hr'g Ex. 1 at 22, 27. Thus, for the Court to accept Smith's position that he was not mirandized, the Court would have to conclude that Deputy Emch failed to give the warnings, he then misled Detective Moisio by claiming that the warnings were given, both deputies then included the false information in their reports, and both deputies testified to the false information under oath. However, this possibility is simply too unlikely for the Court to accept, and it seems far more probable that the police reports state that *Miranda* warnings were given because Deputy Emch did so. Moreover, Detective Moisio's uncontradicted testimony establishes that he personally confirmed with Smith that Deputy Emch gave *Miranda* warnings before the starting the interview. *Id.* at 118-19. Smith has not presented any evidence to suggest that this testimony is incorrect, and the Court credits Detective Moisio's account.

Turning to Ms. Ebelender's testimony, her version of events does not alter the Court's conclusion. More specifically, she testified that she was present with Smith when the deputies

entered the residence and was detained with him, but she did not hear any deputy provide *Miranda* warnings to the four detained individuals. *Id.* at 176-77, 180. The Court does find Ms. Ebelender to be a credible witness generally,[7] and her contradictory testimony can be harmonized with that of the deputies. While Ms. Ebelender may not have heard the *Miranda* warnings, this is likely due to the fact that she was not arrested or even questioned during the investigation. In turn, the *Miranda* warnings were not of particular importance to Ms. Ebelender, whereas the warnings were of immense importance to Deputy Emch because he knew had just arrested the prime suspect in an overdose investigation. The Court therefore concludes that Ms. Ebelender's testimony is not probative of whether Smith received *Miranda* warnings because her experience was markedly different than Smith's.[8]

Therefore, the Court concludes that the Government has showed it is more likely than not that Smith was given *Miranda* warnings before he was questioned by law enforcement. Smith is, thus, not entitled to suppression of any statements he made during his interview with Detective Moisio.

**B.** **Heroin Withdrawal**

Turning to Smith's argument that his Fifth Amendment rights were violated because he was interviewed while he was in the midst of heroin withdrawal, the Court concludes that this argument can easily be resolved in the Government's favor. In cases involving incriminating statements that are made while a defendant is undergoing drug or alcohol withdrawal, the courts have looked at the interviewing officer's perception of the defendant rather than the defendant's

---

[7] During the hearing, Ms. Ebelender shared information about her sobriety, as well as about her work helping others recover from chemical dependency. Tr. at 173-74. These are remarkable achievements, and the Court commends Ms. Ebelender for having the strength to turn her personal struggles into something positive.

[8] The Court disagrees with the Government's assessment that Ms. Ebelender was not near Smith during their detention. At the hearing, the deputies testified that Ms. Ebelender was detained next to Smith, but she could not be seen in the photograph of the detainees because of the angle from which the photograph was taken. Tr. at 44-45.

actual state of mind. *United States v. Hampton*, 572 F. App'x 430, 434 (6th Cir. 2014). Thus, a *Miranda* waiver and any subsequent incriminating states are valid if the defendant appears to the deputies to be acting normally, even of the defendant is suffering the side effects of drug or alcohol intoxication. *Id.* Here, Smith's argument that his post-*Miranda* statements were involuntary because of his heroin withdrawal can be easily discounted because Smith told TFO Cleveland that he was no longer dope sick. ECF Doc. 143 at 4:37-6:40. Plus, throughout the video, Smith appears lucid and is capable of providing clear answers. *See generally id.* As such, TFO Cleveland would have no reason to believe that Smith's heroin withdrawal was so severe that he was incapable of waiving his *Miranda* rights by participating in the conversation.

## C.    <u>Promises of Leniency</u>

Finally, turning to the interview with TFO Cleveland, Smith argues that he was coerced into waiving his *Miranda* rights through promises of leniency. ECF Doc. 140 at 11-12; ECF Doc. 159 at 6-7. More specifically, Smith claims that TFO Cleveland represented that Smith would be charged only if he "admitted to burying a body in the backyard," and this promise of leniency was so tempting that his will to remain silent was overborn. *Id.*

In response the Government maintains that TFO Cleveland did not make promises of leniency because he never promised that Smith would be charged *only* if he admitted to concealing a murder. ECF Doc. 167 at 9-10. Rather, TFO Cleveland explained that Smith *would* be charged if admitted to that crime, and this did not foreclose the possibility that Smith would be charged if he also admitted to committing other crimes. *Id.*

A criminal defendant's post-*Miranda* statements in response to questioning by law enforcement, including confessions, are admissible against the defendant only when those statements were made voluntarily and without police coercion. *United States v. Binford*, 818 F.3d

261, 271 (6th Cir. 2016); *see also United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003) ("The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary."). The Government bears the burden of proving—by a preponderance of the evidence—the voluntariness of both the defendant's *Miranda* waiver and confession. *Binford*, 818 F.3d at 271 (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

The Sixth Circuit employs a three-part test to determine whether a post-*Miranda* statement was involuntary due to police coercion: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; (3) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). In applying this test, a court must consider the totality of the circumstances to determine whether the defendant's will to resist was overborn by law enforcement's coercive tactics. *Redditt*, 87 F. App'x at 443-44.

Under the first *Mahan* prong, promises of leniency are often permissible and not objectively coercive. *United States v. Delaney*, 443 F. App'x 122, 128-29 (6th Cir. 2011). Indeed, a promise a leniency is not objectively coercive when the officer has the power and authority to follow through on the promise. *See, e.g.*, *id.* at 129 (concluding that an officer's offer to recommend leniency to the prosecutor was not coercive because the officer could keep that promise); *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) ("[P]romises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced." (internal citation omitted)).

Comparatively, to become coercive, the promise of leniency must be either broken or illusory, and an illusory promise is one that "lacks substance and does not actually commit the police to undertake or refrain from any particular course of action." *United States v. Siler*, 526 F.

App'x 573, 575 (6th Cir. 2013) (internal alterations omitted). Likewise, "a promise is problematic if a police officer leads a defendant to believe that he 'will receive lenient treatment when this is quite unlikely,' and makes a promise, without authorization by the prosecution." *Id.* (quoting *United States v. Little*, 9 F.3d 110(Table), *9 (6th Cir. Nov. 4, 1993)). Essentially, the promise of leniency must be "so attractive" to the defendant that his will to refrain from making incriminating statements is overborn. *See Delaney*, 443 F. App'x at 128.

Here, the question of whether Smith was coerced into waiving his *Miranda* rights presents the closest call of all the suppression arguments. The interview video shows that TFO Cleveland flirted with making coercive promises of leniency: he encouraged Smith to give him information and suggested that he would look out for Smith, while he simultaneously danced around Smith's questions about how his statements would be used. This had the potential to lull Smith into a false sense of security and may have caused him to forget that TFO Cleveland had just warned him that his statements could be used against him.

Still, the Court concludes that the first *Mahan* prong is not satisfied because the video interview confirms that TFO Cleveland never *expressly* promised anything to Smith. Instead, when Smith asked if he would face charges if he admitted to drug-trafficking, TFO Cleveland avoided the question by stating Smith would be more likely to receive leniency if Smith was honest. ECF Doc. 143 at 34:13-36:45. Similarly, when Smith asked about the Geauga County charges in the middle of the interview, TFO Cleveland did correctly state that the Geauga County prosecutors would determine the charges, *id.*, and this should have put Smith on notice that the same would be true in any other county. Plus, Smith should have some familiarity with how the system works, given that he has a lengthy criminal history. The Court further notes that Smith was offered a very lenient plea deal, which he ultimately rejected. *See* ECF Minutes of Proceedings, March 23, 2021.

Thus, even if TFO Cleveland's statements could be construed as an express promise of leniency, such promise was not illusory or broken. Ultimately, TFO Cleveland never falsely promised that Smith would not be prosecuted if Smith answered his questions, which means that TFO Cleveland's tactics were not objectively coercive.

Smith has likewise not shown that the remaining two *Mahan* prongs are satisfied. Without an express promise, TFO Cleveland's actions could not have overborne Smith's will to remain silent, and the second *Mahan* factor is not met. Moreover, Smith stated during the video that Ms. Knight's death was his motivating factor to participate in TFO Cleveland's investigation and that Smith would "burn every bridge" to take down the drug dealer that sold him the heroin that caused the overdose. ECF Doc. 143 at 47:39-50:38. Thus, the third *Mahan* factor is not met because TFO Cleveland's statements were not Smith's motivation for providing the information to law enforcement.

On balance, the Government has established by a preponderance of the evidence that Smith's post-*Miranda* statements and confessions were voluntary. In turn, Smith is not entitled to suppression of the statements he made to TFO Cleveland.

*****

Therefore, overall, Smith has not identified any basis for the Court to conclude that his Fifth Amendment rights were violated. Rather, Smith was given *Miranda* warnings, and any statements he made after being mirandized were given voluntarily. Accordingly, Smith is not entitled to suppression of his statements to the deputies, and this branch of the Motion is denied.

## CONCLUSION

For the foregoing reasons, Defendant Shawn Ray Smith's Motion to Suppress and Request for a Hearing (ECF Doc. 140) is hereby **DENIED**.

**IT IS SO ORDERED.**

_/s/ Dan Aaron Polster_
**Dan Aaron Polster**
**United States District Judge**